**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **PEDRO CORNELIUS-MILLAN**,<br><br>Plaintiff,<br><br>v.<br><br>**CARIBBEAN UNIVERSITY, INC.**, *et al.*,<br><br>Defendants. | Civil No. 13-1873 (BJM) |

**OPINION AND ORDER**

Following a brawl between Pedro Cornelius-Millan ("Cornelius") and Professor Luis Estades ("Estades"), Caribbean University, Inc. ("Caribbean" or "the University") expelled Cornelius from the University. Cornelius brought this action against Caribbean, Estades, and other named defendants, alleging race discrimination and retaliation in violation of Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d, slanderous defamation in violation of Puerto Rico law, and several other claims. Docket No. 3. Defendants previously moved for judgment on the pleadings, and only two claims survived: the Title VI retaliation claim against Caribbean and the slander claim against Estades. Docket No. 52. Caribbean and Estades each moved for summary judgment, Docket Nos. 70, 74, 91-1, 92-1, and Cornelius opposed. Docket Nos. 81, 87. The case is before me on consent of the parties. Docket No. 60.

For the following reasons, the motions for summary judgment are **GRANTED**.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if it "is one that could be resolved in favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving

party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions" of the record materials "which it believes demonstrate the absence" of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The court does not act as trier of fact when reviewing the parties' submissions and so cannot "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon" conflicting evidence. *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). Rather, it must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. But the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and may not rest upon "conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

**BACKGROUND**

Except where otherwise noted, the following facts are drawn from the parties' Local Rule 56[1] submissions.[2]

---

[1] Local Rule 56 is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." *CMI Capital Market Inv. v. Gonzalez-Toro*, 520 F.3d 58, 62 (1st Cir. 2008). It requires a party moving for summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by citations to the record that the movant contends are uncontested and material. D.P.R. Civ. R. 56(b), (e). The opposing party must admit, deny, or qualify those facts, with record support, paragraph by paragraph. *Id.* 56(c), (e). The opposing party may also present, in a separate section, additional facts, set forth in separate numbered paragraphs. *Id.* 56(c). Litigants ignore the Local Rule "at their peril." *Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 219 (1st Cir. 2007).

Caribbean is a non-profit private university that offers undergraduate and graduate degree programs via four campuses in Puerto Rico: Bayamon, Carolina, Ponce, and Vega Baja. Compl. ¶ 3.1; Docket No. 73-7 at 2. Ana Cucurella Adorno ("Cucurella") is the University's President; Sonia Pacheco Collado ("Pacheco") is the University's Academic Director for the Ponce campus; and Estades is a professor who teaches at the Ponce campus. CSUF ¶¶ 1, 3, 46. Cornelius, a black student, was enrolled in Caribbean's undergraduate engineering program and attended classes at the University's campus in Ponce, Puerto Rico. Compl. ¶ 3.0.

Cornelius first met Estades when he enrolled in his Surveying course, a semester-long class that began in January 2012. CSUF ¶ 1; FSCF ¶ 1. During this course, Estades made somewhat critical comments about Cornelius's work: that his nails would get dirty if he used the instruments in a certain way; that he was hesitant to pick up or carry the instruments; that he relied on other students to do the work; and that he did not want to do the work. CSUF ¶ 4. Toward the end of the semester, sometime around May 2012, Estades and Cornelius got into an argument in the University's library. FSCF ¶¶ 3–7.

---

[2] Estades's Statement of Uncontested Facts ("ESUF"), Docket No. 71; Caribbean's Statement of Uncontested Facts ("CSUF"), Docket No. 73; Cornelius's First Statement of Contested Facts ("FSCF"), Docket No. 82; and Cornelius's Second Statement of Contested Facts ("SSCF"), Docket No. 88. Defendants moved to strike the FSCF and SSCF, arguing that they do not strictly comply with Local Rule 56 and that they rely on the affidavits of two previously undisclosed witnesses: Hector Matos ("Matos") and Oscar Perez Becerra ("Perez"). Docket Nos. 91-1, 92-1. While neither Matos nor Perez were disclosed during the parties' initial or joint disclosures, *see* Docket Nos. 59, 91-2, Matos's affidavit need not be stricken because he was revealed during Cornelius's deposition. Docket No. 71-1 at 214–15; *Rojas v. GMD Airlines Servs., Inc.*, No. CIV. 13-1578 BJM, 2015 WL 3658071, at *3 (D.P.R. June 12, 2015) ("supplementation is only required if the additional information has not otherwise been disclosed during the discovery process") (citing Fed. R. Civ. P. 26(e)(1)(A)). Perez's affidavit is not similarly situated—as a review of the record indicates that he was first disclosed in Cornelius's opposition to the summary judgment motions. *See Pina v. Children's Place*, 740 F.3d 785, 793 (1st Cir. 2014) (within court's discretion to strike testimony included in affidavit of person not disclosed during initial disclosures); *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 5 (1st Cir. 1994) ("we think it significant that the affidavit was offered only after defendants had filed motions for summary judgment"). Cornelius did not come forward with evidence to the contrary, and so Perez's affidavit is stricken. After doing so, I do not read the FSCF or SSCF as creating a genuine dispute of material fact.

Seemingly challenging Cornelius to a fight, Estades asked Cornelius to accompany him outside so they could "solve this right now." FSCF ¶ 4. Apparently up for the challenge, Cornelius followed Estades outside. FSCF ¶ 4. After exchanging a few words, the stand-off diffused and the two went on their way. FSCF ¶ 5. Cornelius did not report to the University the incidents up to this juncture, and claimed he did not do so because he planned to take Estades's Advanced Surveying course. FSCF ¶ 7.

The following semester, Cornelius enrolled in Advanced Surveying, which was held from August to December 2012. ESUF ¶ 2. Around the end of December 2012 or early January 2013, Cornelius learned that he received a "B" as his final grade in Advanced Surveying. ESUF ¶ 3. He thought he had earned 100% of the points for the class and so did not agree with the percentage points he actually received: 87%. ESUF ¶¶ 4–5. He challenged that grade when the new semester began in 2013 by submitting the necessary form to the University's Registrar's Office. ESUF ¶¶ 5, 7. Though he does not recall anything that he included in the form, he is sure that he did not immediately receive a response from the University. ESUF ¶¶ 8–9.

On the afternoon of February 12, 2013, Cornelius was in the University's library with a fellow student, Jean Carlos Ayala ("Ayala"), who also had requested a grade change from Estades. ESUF ¶ 10. Estades approached them to discuss each of their requested grade revisions, starting with Ayala. ESUF ¶ 12. As the two discussed the matter, Estades started to "get mad." ESUF ¶ 13. At this point, Cornelius interjected to discuss his request for a grade change. ESUF ¶ 13. Irked by the interjection, Estades told Cornelius, "Shut up, you cocky man," and continued talking with Ayala. ESUF ¶ 13. In Cornelius's presence, Estades next told Ayala that Cornelius was a "cocky man" and "little crybaby." ESUF ¶ 14. Estades continued to insult Cornelius, became angrier, and challenged him to go outside because they were going to "solve this as men." ESUF ¶¶ 15–16.

Apparently accepting the challenge, Cornelius followed him into the library's lobby area. ESUF ¶ 17. Cornelius told Estades that he "was not well" and that he was "as much of a professor as" Estades. ESUF ¶ 17. Upon hearing this, Estades became even angrier, called Cornelius an "asshole," and asked him to go outside so that he could "break Cornelius's face." ESUF ¶ 18. Cornelius followed Estades into an outdoor patio area, where Estades called Cornelius a "cocky black man" and leveled a "full-swing slap" onto Cornelius's face and chest. ESUF ¶¶ 19–21. Estades then "got in Cornelius's face," prompting Cornelius to hit him, in his words, "as men fight." ESUF ¶ 21. Once the scuffle ended and the dust cleared, Cornelius apparently had gotten the better of Estades: the latter's face was bloodied and his eyes injured, while Cornelius remained virtually unscathed. ESUF ¶¶ 22–25.

Following the bout, and in the presence of Ayala, other professors, and university personnel, Estades claimed that Cornelius had hit him from behind "like a traitor." ESUF ¶ 26. Also at that time Estades told Cornelius that he was a "homosexual," "cocky man," "little lady," "little woman," "crybaby," "black man," and "asshole." ESUF ¶ 27. He also expressed that Cornelius "does not have what it takes to be an engineer." ESUF ¶ 32; FSCF ¶ 29. Cornelius had the police summoned; upon their arrival, the police spoke with Pacheco, the University's Academic Director for the Ponce campus. CSUF ¶ 24; FSCF ¶ 25. Thereafter, Cornelius was approached by Caribbean's security guards and told that, per Pacheco's order, he was expelled from the University and had to leave immediately. CSUF ¶ 25. After speaking with the police about the incident, Cornelius refused to leave the University's campus and went to his evening class. CSUF ¶¶ 27–29.

Pacheco arrived to the classroom accompanied by two of the University's security guards and asked Cornelius to leave. CSUF ¶ 30. Cornelius exited the classroom and was escorted away from the campus by Pacheco. CSUF ¶ 31. At that time, Pacheco informed Cornelius that he had actually been summarily suspended for five days, and that he would have to meet with Ramon Vazquez, Director of the Dean's Office, before being allowed

to return. CSUF ¶¶ 31, 35; Docket No. 73-7 at 2 (identifying Vazquez's position with the University). She also told Cornelius that, per the University's handbook, an internal investigation would be conducted by a Disciplinary Committee. CSUF ¶ 36. On February 13, Pacheco sent Cornelius a letter confirming his five-day suspension from Caribbean. CSUF ¶ 37. Docket No. 73-5.

Following the University's regulations, Caribbean conducted an investigation into the altercation, which included an opportunity for Cornelius to challenge his suspension. CSUF ¶ 39; Docket No. 73-7. On February 15, an informal hearing was held before a Disciplinary Committee, and Cornelius was asked to attend. Docket No. 73-7. Present at the hearing were Pacheco, an attorney for the University, and Wilmer Laboy. CSUF ¶ 42. Cornelius attended the hearing, explained that his attorney was heading toward the University for the hearing, and requested to have his attorney present. FSCF ¶ 35. That request was denied. FSCF ¶ 35. Cornelius agreed to participate in the hearing only if the University agreed to produce the minutes. FSCF ¶ 36. The University agreed to do so, and Cornelius presented his version of the events leading up to the altercation. CSUF ¶ 42. The Disciplinary Committee also heard the other version of the events: that Cornelius had sucker-punched Estades. CSUF ¶¶ 42, 45.

During the hearing, Cornelius also informed the committee of certain racially disparaging comments made by Estades. CSUF ¶ 43. That same day, he also sent to Pacheco a letter addressed to Vazquez. CSUF ¶ 43. Though Cornelius did not attach the letter to his opposition, the University acknowledges the letter stated that Estades had "made comments referring to the color of his skin." CSUF ¶ 43. Following the hearing, and after preparing a report of the incidents, Vazquez recommended Cornelius's expulsion from the University that same day. CSUF ¶ 45; Docket No. 73-6. While acknowledging that there were multiple versions of the events on February 12, Vazquez found that Cornelius had violated four provisions of the University's General Student Regulations when he fought Estades. Docket No. 73-6. The University's President,

Cucurella, expelled Cornelius that same day. Docket No. 73-7. Citing six provisions of the University's General Student Regulations, Cucurella noted that the decision to expel Cornelius was made collectively by "University Authorities" after the investigation, analysis, and evaluation by the Disciplinary Committee. Docket No. 73-7. Cornelius does not suggest Estades had any influence in this decision, acknowledging that Estades heard about the expulsion through "hallway gossip." FSCF ¶ 38.

## DISCUSSION

Caribbean contends the Tile VI retaliation claim lacks merit because it suspended and later expelled Cornelius from the University because of the February 12 brawl, not for the racial-discrimination complaint lodged on the same day as the February 15 hearing before the Disciplinary Committee. Estades contends the slander claim lacks merit because his statements were not defamatory and, in any event, did not harm Cornelius's reputation.

### I. Retaliation

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d; *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) (Title VI "prohibits race discrimination . . . in all programs receiving federal funds," including "education programs.").[3] To protect those who assert their rights under Title VI, the anti-retaliation regulation provides that "[n]o recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by Section 601 of [the Civil Rights] Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part." 34

[3] Caribbean does not dispute at this juncture that it receives federal financial assistance.

C.F.R. § 100.7(e); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 177 (2005) (*Jackson*) ("Section 602 of Title VI authorizes federal agencies to effectuate the provisions in § 601 by enacting regulations."). As the First Circuit has explained, "[t]his broadly protective anti-retaliation regulation is firmly grounded in the enforcement provisions of Title VI." *Weber v. Cranston Sch. Comm.*, 212 F.3d 41, 48 (1st Cir. 2000).

Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, "was modeled after Title VI," and so the Court has explained that "[t]he two statutes operate in the same manner." *Gebser*, 524 U.S. at 286 (1998); *see also Cannon v. Univ. of Chi.*, 441 U.S. 677, 696 (1979) ("The drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been during the preceding eight years."). In light of the "parallel" between Title IX and Title VI, *Gebser*, 524 U.S. at 286, the two statutes are construed in pari materia. *Shotz v. City of Plantation*, 344 F.3d 1161, 1170 n.12 (11th Cir. 2003). In *Jackson*, the Supreme Court held that "Title IX's private right of action encompasses suits for retaliation," 544 U.S. at 178, and courts have reasoned that such a claim is also available under Title VI. *Weiler v. Vill. of Oak Lawn*, 86 F. Supp. 3d 874, 889 (N.D. Ill. 2015) ("Every court to consider the question since *Jackson* has concluded that Title VI encompasses a claim for retaliation, because Title IX and Title VI are interpreted in parallel.") (collecting cases).

With respect to the analytical framework that governs such claims, the First Circuit and others have held that the Title VII retaliation framework applies to Title IX retaliation claims. *See Milligan v. Bd. of Trustees of S. Ill. Univ.*, 686 F.3d 378, 388 (7th Cir. 2012); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67 (1st Cir. 2002) ("the jurisprudence of Title VII supplies an applicable legal framework" to Title IX retaliation claims). And because Titles IX and VI operate in the same manner and are construed in pari materia, the Title VII burden-shifting framework applied to Title IX retaliation claims has in turn been applied to Title VI retaliation claims. *Bowers v. Bd. of Regents of Univ. Sys. of Ga.*, 509 F. App'x 906, 912 n.8 (11th Cir. 2013); *Peters v. Jenney*, 327 F.3d

307, 320 (4th Cir. 2003) (Title VII retaliation framework applied to Title VI claim); *Palmer v. Penfield Cent. Sch. Dist.*, 918 F. Supp. 2d 192, 199 (W.D.N.Y. 2013).

Accordingly, in the absence of "direct evidence of retaliation," a plaintiff seeking to establish a prima facie case of retaliation under Title VI must show: "(1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) an adverse school-related action; and (4) a causal connection between the protected activity and the adverse action." *See Papelino v. Albany Coll. of Pharm. of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011); *Emeldi v. Univ. of Or.*, 673 F.3d 1218, 1232 (9th Cir.), *republished as amended*, 698 F.3d 715 (9th Cir. 2012) (same); *Peters*, 327 F.3d at 320; *Frazier*, 276 F.3d at 67. That showing made, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Papelino*, 633 F.3d at 92 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). "After the defendant has done so, the burden shifts back to the plaintiff to demonstrate that the articulated reasons are pretextual." *Papelino*, 633 F.3d at 92 (citing *McDonnell Douglas Corp.*, 411 U.S. at 802).

In this case, Cornelius has not come forward with any direct evidence of retaliation. *See* Docket No. 87. And while Caribbean does not dispute that Cornelius was subjected to a school-related adverse action when he was expelled from the University, it contends that he is unable to establish the other elements of his prima facie case. *See* Docket No. 92-1 at 3.

**A. Protected Activity**

At the outset, Caribbean contends that Cornelius did not engage in protected activity. In *Papelino*, a student received a failing grade in a course, and was later expelled from the college, after he was falsely accused of cheating by a professor. 633 F.3d at 87. In that case, the Second Circuit held that the student engaged in protected activity when he complained to the college's dean of student affairs about the professor's discriminatory conduct, which included unwanted sexual comments and advances. *Id.* at

89, 92. Likewise, the *Emeldi* court held that the student engaged in protected activity when she complained to the dean of the college of education and a university administrator about "gender-based institutional bias" and "unequal treatment of female graduate students." 673 F.3d at 1224. As in *Papelino* and *Emeldi*, Cornelius engaged in protected activity on February 15, when he complained about disparaging racial comments to the Disciplinary Committee and sent a letter raising the same complaint to Pacheco (the University's Academic Director of the campus in Ponce) so that she could deliver it to Vazquez (the Director of the Dean's Office). S*ee also* 34 C.F.R. § 100.7(e).

Cornelius suggests that he engaged in protected activity before February 15, but has not come forward with record evidence to support that claim. Indeed, the record evidence negates the complaint's allegation that Cornelius made the complaint to the Disciplinary Committee and sent the letter to Vazquez on February 12. Compl. ¶ 4.2. And although Cornelius claims he "intended to make a formal complaint" on the day of the altercation, there is no evidence that he actually complained before February 15. *See* Docket No. 87 at 13; SSCF ¶ 32. Thus, a reasonable jury could find that Cornelius engaged in protected activity on February 15.

**B. Knowledge**

Although it is undisputed that Cornelius submitted a letter complaining about race discrimination on February 15 and that he had raised the issue before the Disciplinary Committee, the University suggests that its decision makers had no knowledge about the discrimination complaint. Docket No. 74 ¶¶ 14–15. In *Frazier*, the First Circuit held that the plaintiffs' Title IX retaliation claims could not proceed where there was no allegation that the alleged retaliator knew about the discrimination complaint. 276 F.3d at 67. In contrast, the *Papelino* court held that this element was established where the student lodged his discrimination complaint with the college's dean of student affairs and there was evidence that the complaint had been discussed by the college faculty during and after the college's honor code appeals process. 633 F.3d at 92.

In this case, Cucurella was the person who made the ultimate decision to expel Cornelius. Docket No. 73-7. She made this decision after Vazquez's report and recommendation, which explained that Cornelius had been involved in a fight with Estades, that the Disciplinary Committee had credited Estades's version of the events, and that Cornelius had broken several school rules when he fought Estades. Docket No. 73-6. Because the letter does not inform Cucurella of the discrimination complaint, it is arguable that Cucurella's final decision to expel Cornelius was made without knowledge of the discrimination complaint. *See id.* On the other hand, it is undisputed that Cornelius sent Pacheco a letter that she was to deliver to Vazquez in which he complained that Estades had made demeaning comments about the color of his skin. CSUF ¶ 43. Cornelius also raised the issue during the February 15 administrative hearing, at which time Pacheco told Cornelius to send the letter and gave him her e-mail and fax number. CSUF ¶ 43. Because there is no contention that Vazquez did not receive the letter, and because he was the person who recommended Cornelius's expulsion from the University, a reasonable jury could find that Vazquez, along with Pacheco, had knowledge of the complaint.

A reasonable jury could similarly so find with respect to the person who made the final decision to expel Cornelius: the University's President, Cucurella. The expulsion letter provides that "[f]ollowing the investigation, analysis and evaluation by the Disciplinary Committee for the Ponce Campus and the University Authorities, we have decided to expel you from Caribbean University." Docket No. 73-7. As in *Papelino*, a reasonable jury could find that the University's decision makers, including Cucurella, knew about the discrimination complaint because both Pacheco and Vazquez knew of the complaint and were part of the investigation, because Cornelius raised the issue about the racial comments during the Disciplinary Committee, and because the letter states the decision to expel Cornelius was made collectively by "University Authorities." *See, e.g.*,

*Papelino*, 633 F.3d at 92. Drawing all reasonable inferences in Cornelius's favor, there is sufficient evidence to establish this element of his prima facie case.

**C. Causation**

Caribbean contends that Cornelius's case founders on the causation element. To determine whether causation exists, courts consider the temporal proximity between the protected activity and the adverse action, the sequence of events, any departures from normal procedure, and contemporaneous statements by the decision makers. *See, e.g.*, *Del Pilar Salgado v. Abbot Labs.*, 520 F. Supp. 2d 279, 292 (D.P.R. 2007). Yet, "chronological proximity does not by itself establish causality, particularly if '[t]he larger picture undercuts any claim of causation.'" *Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003) (second alteration in original) (quoting *Soileau v. Guilford of Me., Inc.*, 105 F.3d 12, 16 (1st Cir. 1997)). This point is aptly illustrated by *Sawyer v. Columbia College*, 864 F. Supp. 2d 709, 722 (N.D. Ill. 2012) (*Sawyer*).

In *Sawyer*, the student received a "D" in his Introduction to Marketing course, and contacted one of the college's administrators to request a grade change. *Id.* at 711, 723. Two days later, the student complained that "he was not given the same opportunities as other students because he was the only African–American in the class." *Id.* at 723. The administrator requested to review the student's coursework for the class, "advised him of the steps he needed to take to follow through on his claim and asked him to document all instances of racial discrimination that may have occurred in the class." *Id.* Three days later, and "in the midst of his grade appeal, [the student] was involved in [a] physical altercation with" another student. *Id.* As a result, he was suspended from the college. *Id.* Finding insufficient evidence of a causal connection between the discrimination complaint and the suspension, the *Sawyer* court granted summary judgment on the student's Title VI retaliation claim. *Id.* at 723–24. It reasoned that "[t]he fact that [the student] made his discrimination complaint in close proximity to his eventual suspension

is not enough," particularly where the student "failed to meet the College's legitimate expectations." *Id.*

In this case, Cornelius hangs his hat on the temporal proximity between his discrimination complaint and his expulsion—both of which occurred on February 15—arguing that he "received permanent suspension after Caribbean received formal complaint against Estades." Docket No. 87 at 13. Yet, the "sequence of events," *Del Pilar Salgado*, 520 F. Supp. 2d at 292, reveals a "larger picture [that] undercuts any claim of causation." *Wright*, 352 F.3d at 478. Cornelius fought with Professor Estades on February 12, and was summarily suspended for five days. On February 15, the University requested his attendance at the hearing before the Disciplinary Committee. Cornelius does not suggest that Estades was one of the "University Authorities" who decided to expel him from the University, and acknowledges that Estades heard about Cornelius's expulsion through "hallway gossip." Because the University began the proceedings to suspend and later expel Cornelius from the University before he lodged his discrimination complaint on February 15, and because Estades did not spearhead the disciplinary proceedings against Cornelius, temporal proximity by itself is insufficient to establish the requisite causal link in this case. *See Sawyer*, 864 F. Supp. 2d at 722. Having failed to establish a prima facie case of retaliation, summary judgment is granted on Cornelius's Title VI retaliation claim.

**D. Nonretaliatory Reason & Pretext**

Even if Cornelius had established a prima facie case, he failed to show that the University's legitimate, nonretaliatory reason was pretextual. Once the defendant produces a legitimate nondiscriminatory reason for its action, "[t]he pretext inquiry focuses on the" defendant, and whether the defendant "believed that its stated reason for the" action "was credible." *Ponte v. Steelcase Inc.*, 741 F.3d 310, 323 (1st Cir. 2014). "For a plaintiff to 'impugn the veracity' of the [defendant's] proffered reason is insufficient; instead, a plaintiff must proffer specific facts that would enable a reasonable

factfinder to conclude that the [defendant's] reason for [the adverse action] was a 'sham' intended to cover up the [defendant's] true motive." *Id.* And in attempting to demonstrate that the proffered reason was pretextual, "it is not enough that [defendant's] perception may have been incorrect." *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 31 (1st Cir. 2007).

In this case, the University contends that it expelled Cornelius from the University for violating several school rules during the February 12 physical altercation. This is surely a legitimate, nondiscriminatory reason. *See, e.g.*, *Sawyer*, 864 F. Supp. 2d at 722. And even if the University had an incorrect perception that Cornelius, rather than Estades, was primarily responsible for the fight, this incorrect perception is insufficient to demonstrate pretext. *See Bennett*, 507 F.3d at 31. Importantly, Cornelius did not attempt to address Caribbean's legitimate, nonretaliatory reason, and so did not "proffer specific facts that would enable a reasonable factfinder to conclude" that the University's reason for expelling Cornelius was a "sham." *Bennett v. Saint-Gobain Corp*., 507 F.3d 23, 31 (1st Cir. 2007); *see also Muniz-Cabrero v. Ruiz*, 23 F.3d 607, 609 (1st Cir. 1994) ("A party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal.").

To be sure, Cornelius does mention that the University refused to let him have his attorney present during the hearing before the Disciplinary Committee. Yet, because this decision was made before Cornelius lodged the discrimination complaint, it could not have been driven by a retaliatory animus. Moreover, in *Flaim v. Medical College of Ohio*, 418 F.3d 629, 636, 640 (6th Cir. 2005), the court held that a college was not required to permit the student to have an attorney present during a non-complex disciplinary proceeding that resulted in the student's expulsion from the college. And while Cornelius also points out that the University had an attorney present for the hearing, he does not assert that the hearing was spearheaded by the attorney. *See Jaksa v. Regents of Univ. of*

*Mich.*, 597 F. Supp. 1245, 1252 (E.D. Mich. 1984) ("Had an attorney presented the University's case, or had the hearing been subject to complex rules of evidence or procedure, plaintiff may have had a constitutional right to representation."). In sum, even if Cornelius had established a prima facie case of retaliation, summary judgment would be appropriate because he failed to proffer specific facts that would allow a reasonable jury to find that the University's tendered nonretaliatory reason was pretextual.

## II. Defamation

Under Puerto Rico law, "a private plaintiff asserting a defamation claim against a private defendant must show that the defendant (1) made a false statement, (2) in a negligent manner, (3) causing actual damage to the plaintiff." *Baltodano v. Merck, Sharp & Dohme (I.A.) Corp.*, 637 F.3d 38, 43 (1st Cir. 2011). The cause of action for defamation and libel has three separate sources: (1) Article II, section 8 of the Puerto Rico Constitution; (2) the Libel and Slander Act of 1902, P.R. Laws Ann. tit. 32, §§ 3141–49; and (3) Article 1802 of the Civil Code, P.R. Laws Ann. tit. 31, § 5141. *Aponte v. Calderon*, 284 F.3d 184, 197 (1st Cir. 2002). "In interpreting these various sources of law, the Puerto Rico Supreme Court has explicitly said that Puerto Rico law on libel and slander follows the common law tradition." *Id.* (citing *Villaneuva v. Hernández Class*, 28 P.R. Offic. Trans. 618 (1991) ("Our libel and slander law . . . follows the Anglo–Saxon common law . . . .")). Accordingly, "Puerto Rico courts frequently cite stateside jurisdictions when interpreting their laws protecting personal reputation." *Aponte*, 284 F.3d at 197.

In this case, Cornelius contends that Estades made several slanderous statements before, during, and after the February 12 physical altercation by calling him a "homosexual," "little woman," "crybaby," and "cocky black man."[4] Docket No. 81 at 11.

[4] While Cornelius also highlights statements made before the February 12 altercation, the amended complaint did not plead those prior statements in the slander claim. *See* Docket No. 3. In any event, Cornelius does not assert that the statements made during the Surveying Course

He also takes issue with Estades's statement that Cornelius does not have what it takes to be an engineer. *Id.* "Whether or not particular spoken or written words are reasonably susceptible to a defamatory meaning is a question of law for the Court to determine in the first instance." *Yesner v. Spinner*, 765 F. Supp. 48, 51 (E.D.N.Y. 1991); *accord Damon v. Moore*, 520 F.3d 98, 103 (1st Cir. 2008). While Cornelius homes in on the precise comments made, "[c]ontext matters in assessing such claims: 'The court [must] examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence.'" *Amrak Prods., Inc. v. Morton*, 410 F.3d 69, 72–73 (1st Cir. 2005) (quoting *Myers v. Bos. Magazine Co.*, 380 Mass. 336 (1980)).

Following well-established common law, the First Circuit and others have recognized that "[w]ords uttered face to face during an altercation may well be understood merely as abuse or insult," not defamatory statements. *Stanton v. Metro Corp.*, 438 F.3d 119, 131 (1st Cir. 2006) (quoting Restatement (Second) of Torts § 566 cmt. e (1977)); *Beverly Enters., Inc. v. Trump*, 182 F.3d 183, 187 (3d Cir. 1999) (citing Restatement (Second) of Torts § 566 cmt. e). The Restatement (Second) of Torts aptly explains that "vulgar name-calling is frequently resorted to by angry people without any real intent to make a defamatory assertion, and it is properly understood by reasonable listeners to amount to nothing more. This is true particularly when it is obvious that the speaker has lost his temper and is merely giving vent to insult." Restatement (Second) of Torts § 566 cmt. e. For example, "when, in the course of an altercation, the defendant loudly and angrily calls the plaintiff a bastard in the presence of others, he is ordinarily not reasonably to be understood as asserting the fact that the plaintiff is of illegitimate

---

were false (i.e., that he relied on other students to do the work). Moreover, the other statements made before the February 12 altercation constitute the same nonactionable name-calling and epithets discussed herein.

birth but only to be abusing him to his face." *Id.* In cases presenting such circumstances, "[n]o action for defamation will lie." *Id.*

With this authority underfoot, and after considering the specific context in which the statements above were made, Cornelius's contention that the statements Estades made are actionable is untenable. *See Stanton*, 438 F.3d at 131; Restatement (Second) of Torts § 566 cmt. E. These statements were made before, during, and after the February 12 physical altercation. Because the statements were made when Estades, as well as Cornelius, had "lost his temper," the name-calling and epithets that were launched do not support an action for defamation. *See id*; *Manns v. Leather Shop Inc.*, 960 F. Supp. 925, 929–30 (D.V.I. 1997) ("No matter how obnoxious, insulting, or tasteless such name-calling, it is regarded as a part of life for which the law of defamation has no remedy."). Indeed, in light of the context in which the statements were made, Ayala understood the barrage of statements as nothing more than attempts to insult Cornelius. CSUF ¶¶ 32–34. Moreover, Estades's statement that he does not believe that Cornelius has what it takes to be an engineer is a statement of his opinion, not one of fact, and so it would not be actionable in any event. *See Piccone v. Bartels*, 785 F.3d 766, 772 (1st Cir. 2015) ("Where an expressive phrase, though pejorative and unflattering, cannot be 'objectively verified,' it 'belongs squarely in the category of protected opinion.'") (quoting *Levinsky's v. Wal–Mart Stores, Inc.*, 127 F.3d 122, 129 (1st Cir. 1997)). Accordingly, Cornelius's slander claim lacks merit.

To be sure, Cornelius presses that Estades called him a "homosexual." A defamation suit under Puerto Rico law is meant "to provide compensation for the harm to the reputation and loss of good name of the person libeled or slandered." *Soc. de Gananciales v. El Vocero de P.R.*, No. CE-91-414, 1994 WL 909249 (P.R. Feb. 7, 1994). The majority of courts that previously found a false accusation of homosexuality to be slander per se reasoned that such a statement imputed criminal conduct. *See Albright v. Morton*, 321 F. Supp. 2d 130, 137 (D. Mass. 2004), *aff'd sub nom., Amrak Prods., Inc. v.*

*Morton*, 410 F.3d 69 (1st Cir. 2005); *Plumley v. Landmark Chevrolet*, 122 F.3d 308, 310–11 (5th Cir. 1997) ("when Hamilton called Plumley a 'faggot', Hamilton imputed the crime of sodomy to Plumley. Therefore, the alleged remark is slander per se . . . .") (*Plumley*). In *Lawrence v. Texas*, 539 U.S. 558, 578 (2003) (*Lawrence*), the Supreme Court held a Texas statute criminalizing homosexual conduct unconstitutional under the Fourteenth Amendment's Due Process Clause, reasoning that "two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle" were "entitled to respect for their private lives" and so the "State [could not] demean their existence or control their destiny by making their private sexual conduct a crime."

Reasoning that *Lawrence* has extinguished the rationale underlying cases like *Plumley*, recent case law holds that falsely accusing a person of being a homosexual is not slander per se. *Stern v. Cosb*y, 645 F. Supp. 2d 258, 275 (S.D.N.Y. 2009) ("the fact [that there is] prejudice on the part of some does not warrant a judicial holding that gays and lesbians, merely because of their sexual orientation, belong in the same class as criminals."); *Albright*, 321 F. Supp. 2d at 138 ("If this Court were to agree that calling someone a homosexual is defamatory per se—it would, in effect, validate that sentiment and legitimize relegating homosexuals to second-class status."); *Carvajal v. Pride Indus., Inc.*, No. 10CV2319-GPC MDD, 2013 WL 1728273, at *12 n.7 (S.D. Cal. Apr. 22, 2013) (same); *Garcia v. MAC Equip., Inc.*, No. CIV.A. H-09-902, 2011 WL 4345205, at *13 (S.D. Tex. Sept. 15, 2011) (same). And at least one court has held that such a statement is not susceptible to a defamatory meaning. *Murphy v. Millennium Radio Grp. LLC*, No. CIV A 08-1743 JAP, 2010 WL 1372408, at *6 (D.N.J. Mar. 31, 2010) ("assertion that someone is homosexual is not defamatory"), *vacated on other grounds*, 650 F.3d 295, 310 n.19 (3d Cir. 2011).

Having noted that falsely accusing someone of being a homosexual can no longer be considered slander per se, I need not delve into whether the remark was susceptible to

a defamatory meaning in this case for three reasons. *See, e.g.*, *Albright*, 321 F. Supp. 2d at 138. Most importantly, and as explained above, the remark was made in the midst of a physical altercation—when Estades had clearly lost his temper and was attempting to insult Cornelius. *See, e.g.*, Restatement (Second) of Torts § 566 cmt. e. The context in which the statement was made places the statement outside the ambit of protections afforded by defamation law. *See Manns*, 960 F. Supp. at 929–30.

Second, Cornelius, who was enrolled in the engineering program and presumably strives to become an engineer, does not assert that "he lost any specific professional opportunities because of" this specific statement, nor did he adduce specific evidence to support that particular assertion. *See Albright*, 321 F. Supp. 2d at 139. Without doing so, the claim he presses is doing "nothing more than trading in the same kinds of stereotypes that recent case law and good sense disparage." *Id.*

Third, Cornelius does not cite any Puerto Rico law that is contrary to the foregoing, and so there is nothing to suggest that the result would be different under the law of that jurisdiction. *See Aponte*, 284 F.3d at 197 ("as currently developed by Puerto Rican courts, there is nothing that suggests that we should treat the protections accorded to reputation by Puerto Rico any more broadly than those granted in other United States jurisdictions"). Thus, summary judgment is granted on Cornelius's slander claim.

## CONCLUSION

For the foregoing reasons, the motions for summary judgment are **GRANTED**, and all claims are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**
In San Juan, Puerto Rico, this 18th day of May 2016.

S/ Bruce J. McGiverin
BRUCE J. MCGIVERIN
United States Magistrate Judge